David Allen appearing for Appellant, Ronald Ellett appearing for Appellee. I have to pause for a minute when I have this sort of flip and I'm sure it's nice to give you a pause as you change cases. So in this case, Mr. Allen, do you wish to reserve time? Yes, your honor, I reserve three minutes. All right, thank you. You may commence. All right, yeah, it's a little tricky to switch hats. No doubt. Bear with me. May it please the court, I represent ANS Funding, actually ANS Funding, LLC. I try not to confuse ANS and AND. It's also a little hard in this case, but AND, of course, is Ms. Groves' property. I know the court is familiar with the facts here, so I won't repeat those. But what we have here, kind of maybe ironically again, is a real estate flipper. And that's what Ms. Groves does. There's no question that she's sophisticated. There's no question that she does what she had done for quite a period of time. And in fact, she not only went out and got loans to do her real estate flipping, she in particular dealt with Merchant's Bank. This was the eighth separate loan that she had done with Merchant's Bank. And on three of them previously, they were structured similarly where she not only put up the investment property as her security, she also put up the equity in her house. And her house has always had the first trustee against it. So when I say the equity, it was... As a point of real quick clarification, was it her house, was it her home in every one of those three transactions? I thought that was disputed. Actually, that's a good point, Your Honor. I'm sorry. It was definitely her home on the last two transactions. The transaction and the subject rancho transaction. As to whether it was her home or just another piece of property she owned where she was living at the time, you're correct, Your Honor. That was... Okay. But the biggest point here isn't so much whether or not she lived there. The point is that she was very familiar with the concept of cross-collateralization. So in other words, the fact that if the investment property itself was not sufficient in first position to secure the loan, that she would then put up a second piece of property or the equity she had in a second piece of property, which was the 44th Street property that eventually became her home. And that's what she put up as additional transaction, additional security. And what's particularly noteworthy here is the similarity between the State Street transaction and this transaction. And there's a couple reasons it's noteworthy. One is that the gentleman, he goes by Bo, Robert Bo Siemens, that Mr. Siemens was the loan officer for merchants on both of those transactions. He had not been the loan officer on all the prior ones, but he was the loan officer on both of those. He testified in detail regarding the way that that loan was structured with her and that that's how she wanted it and she was very happy with it and that was a very successful transaction. And that was actually the genesis of this transaction because after having... Can I stop you for a second? There were two findings and I think we're going to end up at the same place, okay? There were two findings that I think are fairly important here that I'd like you to tell me what your argument is about them. One is that, and you may find this implausible, that Ms. Groves testified that there was no specific discussion beforehand about the term of the loan. That's one. And the second one was when she went to the close and she saw all the documents for the first time and among other things, that warranty deed was not her idea, but it was one of those closing things because we said so. You know, we're a title company. We say, so please do it. And she found, the trial court found both of those, you know, believable, incredible and so determined. So are you telling us that those findings of fact are clearly erroneous or are you telling us that it just doesn't add up somehow? That's different. Yes, Your Honor. Thank you. Those findings of fact are absolutely clearly erroneous. Quite honestly, they're absurd and I was shocked. How can you say, you know, the witness, I mean, it wouldn't have been very hard if there had been a discussion to have somebody so testify and the testimony was I must have said that. There was no testimony in the record from your client saying those discussions occurred. How can you say it's, you know, I agree. Was there a commitment letter for this? There wasn't a commitment letter. What there was, was there was a, and part of the record is the loan write-up, which shows that the way the transaction was supposed to be structured. But that's Mr. Seaman's product, correct? That's merchant's product. Yeah, and the loan write-up is Mr. Seaman's product. That is correct. But here's what, you know, when... Can I say something? I get it. This doesn't make any sense. That part I get. It's not a good deal and nobody who was thinking about this would have done it. I'm with you there. The question is how are we going to get to mutual mistake or unilateral mistake or ambiguity? Because, okay, we'll get to all those. First of all, you're correct. Nobody in their right mind would have, no lender in their right mind would have done it. And the important point here is Ms. Groves knowing full well that the lender would have never done it. Even if you believe, Ms. Groves, that the concept of security was never discussed, which is an absolutely ludicrous thought, that she would go in to get her eighth loan with this company and never have any discussion. That was her testimony. We never talked about security. We never talked about the terms of the loan. It's absurd. I mean, there's no way. I mean, obviously, you know, in terms of the way... How does the fact that they're having to transfer a fee interest, a portion of the fee interest in her own home to somebody else? I mean, she walks in. To my mind, that's a critical piece of this, because that's bizarre, too. That is bizarre. And the only way that that could happen is that she directed it. People are not... You know, the story that she spun, which is, well, the escrow company told me to do this, or the escrow company... Why didn't you put the escrow company witness in? I mean, again, it's pretty easy to have the escrow say, she told me... I mean, you know, I can ask them the same question, but... As an appellate court, we're sitting here asked to assess findings of fact, and you look at the trial record and you go, well, I think I might have asked. If my theory was that she said it and she's lying, I think I might have brought the escrow company in to say they instructed us. The person that was involved in the escrow company was not around, could not be found. I mean, there was certainly reasons for that. But again, you have to get to a question of what makes sense. I mean, this court cannot sanction an absurd result. And it just makes, you know... And the court, I know, is going to point out the word, well, we would have talked about it, as being, well, that doesn't mean you did talk about it. Yeah, that's what it means. Is this kind of like if you have, you know, if you are being asked about it... But no offense, that's just not what the trial court thought it meant. She had definitive testimony, which you may think is not correct or implausible or whatever, but the trial court, watching the witnesses, had definitive testimony. We did not talk about that. And had less than definitive testimony from Mr. Siemens. Well, we would have, but I'm not telling you we did. And so she makes the findings. And it's credibility. I mean, she's watching the witnesses. So, gosh, that's an awfully high burden, isn't it? Two things, Your Honor. First of all, I think that she misconstrues the word we would have. If, for example, you had a conversation a couple years ago with a dying relative, and somebody says to you, well, did you tell them you loved her? And you say, yeah, of course I would have told her that. Well, I mean, in most instances. That was the word he used, but it doesn't mean he didn't do it. He did testify. He testified in detail that we had several telephone conversations, that we talked about the terms of the loan, that we talked about the fact that there was going to be cross-polarization. As a matter of fact, it was undisputed. Even she admitted, I believe, that she came into the office asking for this loan, and saying that last deal, the State Street deal, went really well. Let's do it again. Well, what does let's do it again mean? Let's do it again means let's do the same deal, which was basically. . . I don't think there's any question that if the documents put in front of her had been the documents that reflected exactly the same deal, she would have signed them. I don't think that's the issue here. The issue is the documents that were put in front of her by your client. I know you dispute that your client put the deal in front of her. Frankly, in terms of plausibility, I think it's just not really plausible to me that she would have created that or directed it. But isn't it illogical to say your client just messed up? Well, Your Honor, we have to get. . . I want to go back to your question regarding ambiguity. Again, I found it shocking that the court did not find this to be ambiguous. If you look at the preamble, which is not, of course, part of the operative document, it's only a preamble, it's only a recital, and I cite authority in my brief that that's not part of a document. But if you look at it, it says it has that parenthetical as to Exhibit A-1 and as to Exhibit A-2, which worked in the State Street deal because A and D owned the entire investment property, and she owned 44th. It doesn't work. Can I – to exactly that point, and I think it's a really good question, is this a situation where there's a difference between ambiguous and confusing? Because ambiguous means, okay, there's at least two meanings a sane person could take away from this document reading the language as opposed to why would anybody do this, which is a whole other question, right? It is, Your Honor. So help me with that part, please. Sure. You have ambiguity when you look at two different parts of the same document. So we first look at the recital, which clearly says as each is pledging one half. It says that if you look at the parentheticals. Then you go to Paragraph 1, and Paragraph 1 says that grantor, which is the two of them, her and A and D, grantor in consideration of the indebtedness hereby grants this property, and then it goes on to describe the entirety of properties A1 and A2. And so in the recital, you have a grant of half. In Paragraph 1, you have a grant of a whole. And then we have another extrinsic document that is part of this. Is that true only if I don't take your opponent's side of what the function of that definition is, that grantor really does set the terms? If he's right about that, then I think we have a problem with the theory, right? Well, the argument that he makes doesn't make any sense. What he wants to do is he wants to define grantor not as terms or individual. Okay, but again, I'm coming back to this between confusing as in why would anybody do this and ambiguous as in there are really two different meanings here. I'm not getting to the two different meanings here, so help me with that part. Okay, the two different meanings is in Paragraph, in the recital, the meaning is they're each putting up half. In Paragraph 1, the meaning is they're each putting up the whole. It says grantor. The grantor is defined as the two of them. A grantor is not an interest in property. A grantor is a party. The party here is rows and A and D. The grantor grants the real property described in A1 and A2. There's no half of the property, and clearly that was not the intent, and clearly there's an ambiguity here by that recital. That recital needed to be corrected by the striping of the parenthetical. That was a mistake. Either that's a mutual mistake because she knew perfectly well that that was wrong, so it was a mutual mistake, or it's a unilateral mistake, again, because she knew that that was not the deal. She testified, oh, yeah, when I signed the documents, I recognized that fact, and I figured, hey, that's their problem. I'm not going to bring it to their attention. It was clearly, I mean, if ever there's been a case or take a page out of it. Let me ask you this. Would that be inevitable conduct by itself? She looked at it and said, well, this is better than I thought. Would that be inevitable conduct by itself? Clearly inevitable conduct. That's the whole purpose. Okay, so the fact that she didn't point out their mistake is inevitable conduct for unilateral mistake purposes. Absolutely. Okay. All right. You're in your three minutes. Do you want to reserve? Yes, ma'am. All right. Thank you. Thank you. Mr. Ellett. My client has an interesting theory, and you get to go to court and prove your theory by calling witnesses. So his theory is that my client directed the warranty dates. The problem is not a shred of evidence. Yeah, Mr. Seaman's involvement here was sales, negotiate the deal, tell the loan processing department, here's the deal. And at that point, he seems to be no longer involved. Is that fair? That's what Mr. Seaman told us when I tried to ask him, well, how did this mistake happen? What was the mistake? Yeah. No answers. I can't answer that. When I asked him who prepared the documents, he told me someone from the processing department, merchants. Yeah. But there's no evidence. I mean, it's an interesting theory that it must have happened, but there's no testimony. And, oh, I couldn't find the witness. There were no motions or anything about trying to find a missing witness. The other thing is we communicate by e-mails nowadays. When I want something done, I send it to my people on my team. Here's the e-mail. This is what we're doing. This is what's going on. I subpoenaed the e-mails. Got nothing. Nothing. Those are the e-mails that should have been used to prove his case.  Merchants' e-mails. What do they say? I don't know. But it isn't now for us to say, well, those e-mails, had I actually brought them to trial or had I brought a witness, I could have proved that Mr. Groves directed these warranty deeds. Not a shred of evidence. And that's the problem with his entire case. It's an interesting theory. And he may very well have a point that merchants might not have intended the documents to say exactly what they did. Boy, we're asking a lot from my client, who is a realtor but is not a mathematician, to have sat down and calculated, okay, so you're going to have equity in this home, have equity in the investment property. There's $100,000 over here in an account that you have a collateral interest in. And if I take all those numbers and do them in my head, currently sitting here as I'm trying to go through my day, I would conclude that you made a mistake in your numbers. The loan-to-value, if you included the cash deposit, they argued the loan-to-value based on the 50% of the two properties, the collateral. But if you include the cash, the lien on the cash account, which I assume they properly liened up, what was the number? It's still less than 100%, but I think it's in the neighborhood. Again, I think it's in the record. It's around 85% or so. But I'll tell you this, there were three different tries by my opponent and his witness to get to that number. They left out the collateral to the fact, and they didn't do the math right. And I finally got the guy who's supposed to be able to do the documents after a year and a half to testify correctly about what the collateral was. But my client, who doesn't do that for a living and whose job it was not to do to check those numbers, was supposed to sit there as she's signing the documents and do all the calculations and come up with them. That's their case. Well, and to correct their mistake, right? And to correct their mistake. Yeah. I mean, I think what Judge Taylor said earlier really kind of hits the nail on the head. You go to a closing, and the title company says, do this, and you say, okay. And if it turns out to be more favorable, even if by accident, is that an equitable conduct by itself? You could tell me no, wouldn't you? It's absolutely not. I don't even think you have a mens rea here of even understanding that the bank was making a mistake. How would she have not? It's just implausible that she would have been double-checking their numbers. It is a little strange that apparently nobody from the lender's side was at the closing. I don't know when they looked at the documents. The loan's transferred, and nobody seems to recognize this. You go through months. There's a default. Nobody says anything about this. There's a bankruptcy. You apparently try to confirm the understanding. And months after that, merchants come in and say, whoopsie. That's a little unusual by itself. I'm going to certainly talk to Mr. Allen about that. Building on your point, there's also a provision in the documents that my client signed that she would change if there was a mistake. They never came forward and said, oh, there's a mistake. And you're also left with Mr. Siemens, who in several instances admitted, and it's in our brief, admitted that what he testified to would not appear to be true to an objective observer, that you would have to see it from a particular point of view to see that that's correct. For instance, like when he testified about the collateral amount the first time. So now they're saying we should give his testimony a great deal of weight, even though he was caught several times not being truthful in front of this judge, and who never used the word credible as it related to Mr. Siemens, but we should not find credible my client's testimony, even though the judge says it was credible. There's nothing that remarkable about my client's conduct in this case. She went and signed the documents that were put in front of her. She's not a mathematician. I'm pretty good at numbers. I'm not even certain I would have sat there and ran those calculations if somebody had put that in front of me. My clients are real. They're not a mathematician and not a loan officer. Ambiguity. And I forgot that this, you just said, Judge Lefty, that this issue didn't bubble up until post-petition, right? Yeah. We put in our plan, and we said, okay, we'll tell you what. You've got a half interest in each. We'll give you the more valuable. We'll take the less valuable. Let's move on down the road. They said, no, that's not going to work. So there's a question about what could be done at that point. Right. Yeah, we had to as part of confirming a bankruptcy plan. That's where it popped up. And so this is actually going to hurt the creditors, the other creditors, if this creditor is allowed to take more. Otherwise, we're going to be close to paying them 100 cents on the dollar. At the end of the day, they're burden of proof. They're asking you to disregard a witness who they can't point out, oh, she lied or anything. They say, it must not be true. She must have directed the warranty deed. That's implausible, anyhow, that the warranty deed was just directed by her. At a minimum, the title company, if they had been directed by my client, would have gone back to the bank and said, is this okay? But the warranty deed is a bizarre thing to just say, I think. And there is an explanation as to what happened. And the merchants and this lender are very close. They share a lawyer together. Everything ran through this counsel for both of them. Merchants could have come forward and told us what happened here. They didn't. They'd like us to not look behind the black box and just infer what must be back there. And it must be an evil borrower that caused this, which is implausible. It's a mistake that they made. The assignment, he says, you know what we need to do on this promissory note? This was yesterday. We need to cross out this as to A1 and as to A2 stuff because that's messing it up. That's just the leftover from before. That's in the assignment as well, the assignment that his client got. How many times can you keep doing the same thing and say, oh, that's an inadvertent mistake made by a bank? So it's really not plausible. Their argument is the one that's not plausible. And they had the burden of proof. My client went in and testified. She didn't direct the warranty deed. She signed the documents in front of her. She doesn't recall any conversations about taking 100% interest in her home. And what are we talking about? We're talking about taking an interest in somebody's home, one of the most important things you have here, or having a bank bear the consequences of their own sloppy work. So do you lose your home? Or does the bank get to say, oh, that was a mistake. You never agreed to it, but you would have. My client did testify she would have likely signed what was put in front of her. But that doesn't mean she did. It's just a hypothetical. So you don't get to go back and redo the deal. So the other thing is lack of joining A&D consultants. Now, I knew that there was an appeal going on. I did not know that A&D consultants was a party to the appeal. Why did I not know that? Because it's not in the brief and it's not in their notice. And it is required to be in their notice. Rule 803 says you have to submit your notice of appeal in the substantial as the official form. The official form only asks you to do three things. Who's the appellant? Who are the appellees? And what's the order? There's only three things. So are you telling us, for example, if we were to reverse, we would have no ability to direct A&D to do anything? Yeah, I think that's one of the grounds. No, wait, to reverse. Oh, if you were to reverse. For example, if you were to reverse, then we would have no power to tell A&D to do anything one way or the other, because they're not a party to this. Right. In fact, I think it's even worse than that. I think because they're a co-owner, I don't know that this case has joined an essential party here. And the idea that you can just not list them, and their argument is going to be just like Mrs. Groves was, oh, she must have known, is that, oh, Mr. Ellett must have known. No, I didn't know. I thought it was a strategic decision. There's a Rule 19 argument that my client has. It's actually kicking around down in the bankruptcy court. When you come forward under Rule 19 and you bring a counterclaim, which they did, you have to bring all your counterclaims. And they never brought any claims under the note. So for a bankrupt debtor, there's a defense for the lender under Rule 7,000. Is it Rule 19 or Rule 13? I'm sorry. The rule that says you have to bring your cross-debt. The bankruptcy rules creates a safe harbor if the defendant is a debtor. But A&D wasn't a debtor. So they were required, and I would be arguing right now about A&D's additional arguments, but I didn't bring them because there was absolutely no reason for me to conclude anything other than they'd made the strategic decision to not bring them. They didn't put their name down on the lines where you list them. We didn't file a responsive brief. We didn't raise those arguments. In their reply brief, they say, oh, well, you can grant a motion. What motion? They never filed a motion asking you to allow a briefing schedule to add this party in. They just did nothing. And this is, again, I mean, we're back to, and this is the theme of this case, the other side must have known, even though it's not put down in writing, and in writing is how we do these things. Well, can I, let me take Mr. Allen's side hypothetically for a second, okay? Is it possible to argue, as we do, when an issue comes up, well, it's purely a legal issue. You're not prejudiced. Everybody knows what it is. Is there an analogy here that clearly you know what the issue is, and the fact that A&D wasn't named doesn't really change your argument one way or the other? But I'm saying it would have because A&D has this rule, the mandatory cross-claims, that we didn't get to bring. That's procedural, right? That's not on the merits, right? Procedural matter? Or did you ever? Well, it would go to the fact that if they've waived their cross-claims under the note, what difference does it make what their lien interest is? And so I think they have waived their claims under the note, and that may be percolating up later. I think the real reason, I don't find it plausible that when you're sitting down and you're filling out that notice of appeal and you say, who are the parties to the appeal, and there's two parties on the other side that you don't write both their names down. I find that implausible, that a lawyer wouldn't do that, or that in the brief you wouldn't enlist it. I think this was a strategic decision. It would be extraordinary negligence, then followed by just outright disregard of the rules by not filing a motion. And it has been prejudicial to A&D consultants, and it just happens because I represent both of them that I'm able to even speak on their behalf today. One quick housekeeping matter. There was an attorney's decision here, right? And that was submitted to the bankruptcy court? Yes, and it's pending. It's been argued and should have a decision any day on it. Okay. Thank you. Thank you. Thank you. The statement that Mr. Eller makes repeatedly that his client's not a mathematician is a total red herring. Ms. Gross testified that it was also very implausible, by the way, but she testified that when she was given the documents to sign, that she recognized that the documents were drafted in such a manner as to only give one-half interest in each property and security as opposed to the entirety of both properties. And she knew it, and she just said, Well, you know, it's not my job to tell them if they make a mistake, and so she just went ahead. It's the same thing you're on. I mean, this is the whole point of equitable relief. It's the same thing as if you go buy a car for $100,000 and the car dealer makes a mistake in drafting the contract. What's the coercive – you're sitting here saying she clearly knew they'd made a mistake. Okay, fine. But you're also implying that she knew that it was a horrible business decision, and I'm wondering if somebody has made me give away half my home and if someone, assuming again the bankruptcy judge has found that she didn't direct that grantee, and someone is in the position to foreclose and own half my home, doesn't that carry enormous coercive power? Can we really look at that from a numerical perspective and say it was stupid numerically, but she was going to have to deal with you, right, to keep her home? Well, Your Honor, I asked her. I said, you're experienced in obtaining loans. Yes, you're experienced in real estate. Yes. Have you ever heard of a lender being willing to take a half interest on a property of security? Mr. Siemens testified that would never happen because it's a – But my question is a little different. My question is have you ever heard of someone giving someone a half interest in their home, fee title transfer, and encumbering the remaining balance? That was my question to her. Have you ever heard of a deal being structured? I'm just suggesting that it's bad on both sides. It isn't the point, as Judge Taylor's question I think implies, that it's not – and I think this came out at trial. It's not as if you didn't have recourse. It's not as if your client couldn't have done something to foreclose even on the half interest, which, as Judge Taylor points out, is the whole risk here. I mean this is the whole individual thing. And this goes to the other – Yeah, if I thought I've gotten you paid every dime, but I mean if that ain't leverage, I don't know what is. Well, there is – I mean that's not leverage because if you foreclose successfully, you have a half interest. What are you going to do with it? Who's going to buy a half interest in her home? Nobody. Or move into the bedroom I suppose. I mean I've been seriously – I don't want somebody owning half my home. I'm just going to put it that way. I understand. But a lender doesn't want to own half a home that he can't turn into cash. Understood. Understood. But we're getting into her state of mind. You're trying to say mathematically it was unalloyed bad for you and good for her, and I'm saying not necessarily in my view. Your time is up, and I thank you both for your good arguments. Thank you very much. Again, it's always impressive when someone can come in and do back-to-back arguments. This is the second calendar that I've had to happen. Thank you. Great job. I never did that, so applause to both of you. All right. The next matter.
judges: Taylor, Lafferty, and Brand